JOHN F. WALKER, Conservator of the Estate of Donald Reeves, Incompetent, Plaintiff-Appellant, *v.* MAXWELL CITY, INC., *et al.*, Defendants-Appellees.

First District (2nd Division) No. 81—3179

Opinion filed August 30, 1983.

572

William J. Harte, Ltd., Patrick E. Dwyer, and John J. Lowrey, all of Chicago (William J. Harte, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, E. Michael Kelly, and Milo W. Lundblad, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Donald Reeves sustained serious facial and brain injuries following a collision between his motorcycle and an automobile. He wore a motorcycle safety helmet at the time of the accident, which took place in the village of Oak Lawn. The conservator of his estate brought a products liability action against defendants Maxwell City, Inc., the retailer of the helmet, and Seaway Importing Co./Wessex, Inc., the importer-wholesaler, seeking recovery for injuries he allegedly incurred as a result of helmet's defects. The manufacturer of the helmet, Daiei Kogyo, of Japan, went out of business and was dismissed from the suit. Plaintiff appeals the jury verdict for defendants.

The principal issues raised on appeal include whether: the verdict was against the manifest weight of the evidence; and plaintiff was prejudiced by the purported refusal of the circuit court to allow "destructive" testing of the helmet.

We affirm for the reasons which follow.

On April 15, 1971, the date of the accident, and at the time of the occurrence, Reeves was wearing a Daiei Kogyo model TH-12 motorcycle helmet. The investigating police officer, James Cotter, stated that he found Reeves lying on the ground beside his motorcycle, wearing a red helmet. There were large amounts of blood around Reeves' facial area. The passenger of the vehicle informed Cotter that Reeves hit the windshield support on the right side of the automobile with his head. Cotter noticed no external damage to the helmet. He saw a round dent on the right windshield support.

Reeves was transported to Christ Community Hospital. The examining physician there, Dr. Shu-Yung-Wang, found him in a comatose condition. His traumatic bone injuries and cuts were localized in the area of his jaw and 19 of his teeth were dislodged or broken. There was no tearing, laceration or fracture of any of the area of Reeves' head that was covered by the helmet. Two neurosurgeons, Dr. George Bryar and Dr. Sherman Kaplitz, found that Reeves suffered a severe bruising of the brain, a basal skull fracture, and multiple fractures of his face and jaw bone. Dr. Bryar and Dr. Marshall Matz, a neurosur-

geon testifying for defendants, testified that the "sudden stopping" of the head may cause severe brain damage even without a direct blow to the head or penetration of the skull. The sudden stopping of the skull causes the brain, which is still in motion, to strike against the skull's inner surfaces. This is called a deceleration injury. A blunt injury even to the chin may be transmitted to the brain because the mandible is connected to the skull by means of the temporomandibular joint, which is one of the sidewalls of the brain cavity. Dr. Matz indicated that his review of Reeves' records revealed none of the signs that might be seen if there had been a direct injury to the head area covered by the helmet. He was of the opinion that the impact to Reeves' face was transmitted along the jawbone to the skull, causing a basal skull fracture, and that the force was from below upward. If the blow is to the face, no amount of padding at the top of the head can reduce the deceleration injury.

Dr. George Snively, M.D., director of research of the Snell Foundation (Snell), was of the opinion that the helmet did not come "into play" during the accident. The helmet, however, would have to be disassembled and the liner inspected to have a "complete picture." James Albert Newman, Ph.D., an engineer, testified that the helmet did not appear to have sustained any severe impact. Plaintiff's expert, Lee Rose, a design engineer, believed that the helmet incurred multiple hits during the crash.

The Snell Foundation and the American National Standards Institute (ANSI) both establish safety standards for motorcycle helmets. Compliance with these standards is voluntary. Snell standards are generally regarded as more stringent than ANSI's. At the time it was manufactured in the late 1960's, the "TH-12" model helmet worn by Reeves was in compliance with both the Snell and ANSI standards. Reeves' helmet, however, did not meet the Snell requirements when they were upgraded in 1970. In particular, it did not satisfy the requirements measuring a helmet's ability to protect against impact. Reeves purchased the helmet in 1971. There were no standards then regulating impact protection to the facial region.

Newman testified that the outer shell on Reeves' helmet was composed of a fiberglass resin composite. Most helmets in 1970-71 were made of plastic. Fiberglass has generally been regarded as superior. The next layer in Reeves' helmet was composed of expanded polystyrene beads foam, which reflected the most advanced technology of helmetry in 1971. This foam was an "appropriate material" for use in a liner. Its function was to absorb the energy of the impact.

The helmet in question provided no facial protection. Dr. Richard

Schultz, who testified on behalf of plaintiff, stated a helmet with a face guard would have absorbed a good deal of impact force, minimized the forces transmitted into the skull, and reduced the amount of brain damage.

Dr. Snively stated that to do an "optimal job" a helmet must be positioned in front of what is to be protected, namely, the head or nose. As a practicing physician, he would recommend that people protect their eyes and face when motorcycle riding. Newman recommended facial protection for motorcycle helmets. Rose observed that the technology was available to place a "chin bar" on motorcycle helmets in the late 1960's. The cost of adding a chin bar would have been "pennies."

The experts disagreed as to whether the subject helmet was reasonably safe. Defendants' expert, Newman, believed that on April 15, 1971, Reeves' helmet was reasonably capable of providing safe impact protection and in no way "unreasonably dangerous for its intended purpose." Rose believed that the helmet was inherently dangerous for its intended purpose. The helmet was reasonably safe according to Dr. Snively.

I

■ Plaintiff asserts that the circuit court erred in denying his motions for a directed verdict, judgment *n.o.v.* and new trial. He observes that it is foreseeable for a motorcycle helmet to be called upon to protect the head of a motorcyclist. Because the helmet was not equipped with facial protection and did not meet the impact requirements set by the Snell Foundation in 1970, plaintiff argues the helmet failed to protect him adequately.

A manufacturer is not under a duty to design a product which is totally incapable of injuring those who foreseeably come into contact with the product. (*Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104.) To succeed on a strict liability theory, a plaintiff must prove, *inter alia*, that the injury resulted from a condition of the product and that the condition was an unreasonably dangerous one. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) Products are defective when they fail to perform in the manner reasonably to be expected in light of their nature and intended function. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342, 247 N.E.2d 401.) In Illinois, injuries are not compensable in products liability cases if they are caused by those inherent propensities of a product which are obvious to all who come into contact with them. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368; compare

Annot., 95 A.L.R.3d 1066 (1979); see also *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 467, 343 N.E.2d 465.) Strict liability applies only when the product is "dangerous to an extent beyond that which would be contemplated by the ordinary [person] ***, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts sec. 402A, comment i (1965); see *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 220, 412 N.E.2d 959.

It was well within the province of the jury to conclude that a helmet without a face guard, such as the one in dispute, could not be reasonably expected to guard against blows to the face. The absence of a face guard on Reeves' helmet was an intrinsic property of the helmet. A person with ordinary knowledge would not expect a helmet to protect an area which it did not cover. Neither the Snell nor the ANSI standard required impact protection for the face. Plaintiff cites no precedent from any jurisdiction holding that the absence of facial protection on a motorcycle helmet makes it unreasonably dangerous. Applicable Illinois precedent points to the opposite conclusion. In *Fuller v. Fend-All Co.* (1979), 70 Ill. App. 3d 634, 638, 388 N.E.2d 964, the court held that safety glasses without side shields could not reasonably be expected to protect against side particle entry. More recently, in *Artis v. Fibre Metal Products* (1983), 115 Ill. App. 3d 228, 450 N.E.2d 756, the court rejected plaintiff's claim that a safety helmet was defective for its failure to shield against neck injury.

■ The fact that after its manufacture the helmet did not comply with the newest Snell impact standards did not render it unreasonably dangerous as a matter of law in light of the entire record as set forth above. Both Dr. Snively and Newman found it reasonably safe for street use. The helmet satisfied the Snell and ANSI standards in effect at the time of its manufacture. Furthermore, the jury may have concluded plausibly that the purported "inadequate" impact protection afforded by the helmet was not the proximate cause of Reeves' injury. Expert evidence was adduced indicating that the helmet was not involved in the crash and that Reeves' injuries were caused by a blow to the jaw which impacted the brain. The verdict for defendants was amply supported by the record. The evidence when viewed in its aspect most favorable to defendants, does not so overwhelmingly favor plaintiff that the verdict for defendants may not stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Nor was the verdict contrary to the manifest weight of the evidence. (*Mizowek v. DeFranco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32.) Accordingly, plaintiff's motions for a directed verdict, judgment

*n.o.v.* and new trial were properly denied.

## II

■ The next assignment of error concerns plaintiff's attempts to have pretrial testing performed on the helmet. One such test proposed was to perform impact tests on the helmet in order to determine its shock absorbency properties, which would have partially destroyed the shell and would have altered its appearance. The other test sought by plaintiff was to dismantle the helmet "to inspect and measure the styrofoam liner." This would not be "destructive testing," according to plaintiff's motion, and could be accomplished in the office of one of the attorneys through the use of simple hand tools. Following a hearing on April 8, 1980, the circuit court directed plaintiff to obtain a written report from his experts specifically setting forth: a description of the proposed impact tests; what effects the tests would have on the helmet; the reasons for conducting such tests; and a statement as to the relevancy of the obtainable data to the issues of the case. Defendants and their experts were to examine such reports and produce written responses thereto, all reports and responses to be filed with the court. The parties were to meet thereafter and attempt to reach an agreement on the testing; if no agreement could be reached, the matter was to be brought before the court for further hearing. Plaintiff subsequently filed excerpts from a deposition taken of his expert, Rose, together with a report written by Rose, addressing those concerns. When defendants failed to respond, plaintiff moved for leave of court to conduct impact tests. On June 9, 1980, that motion was denied. Thereafter, plaintiff moved for leave to dismantle the helmet, which would not destroy it. An order was entered on July 11, 1980, similar to that entered with regard to the proposed impact testing. Nothing further appears of record showing compliance therewith by the parties.

Plaintiff contends that the was prejudiced when the court erroneously refused to allow him to conduct pretrial tests requiring that the helmet be dismantled. He argues that dismantling the helmet was necessary to determine whether the helmet had been impacted in the accident. The testing, he states, would not have been prejudicial to defendants. The court did not refuse to allow the dismantling of the helmet, however; it reserved ruling on plaintiff's motion until certain expert evidence was presented to the court. The destructive consequences of the proposed tests was a relevant and proper factor to consider in evaluating the merits of plaintiff's motion, particularly since no duplicate original of this helmet was available. See *Sarver v.*

*Barrett Ace Hardware, Inc.* (1976), 63 Ill. 2d 454, 349 N.E.2d 28.

■■ Assuming, for the sake of argument, that the court's order somehow could be construed as a denial of plaintiff's motion, any error was harmless, since plaintiff apparently declined defendants' invitation to have their respective experts, Newman and Rose, dismantle the helmet during trial early in plaintiff's case. Plaintiff claims that this offer was "pure sophistry," because the testing would have taken two weeks and the testing laboratory was in Detroit, Michigan. These statements are based on a prior, separate request made by plaintiff before trial for "impact testing" at an independent laboratory in Detroit, which would have required such time and analysis. Impact testing is completely different from dismantling the helmet to inspect the styrofoam liner. A letter from plaintiff's expert Rose explained that impact testing involved dropping a weight from a specified height onto a helmet containing certain electronic instruments and other equipment to measure the amount of force transmitted. In contrast, plaintiff advised the court in a pretrial motion that dismantling the helmet could be accomplished "*** in the office of one of the attorneys for the parties *** by using simple hand tools" Plaintiff's contention, that defendants' offer to dismantle the helmet was not feasible, must therefore be rejected.

■ Plaintiff also contends that he was prejudiced when the jury was permitted to hear opinion evidence regarding the helmet's role in the accident, because the helmet was not dismantled and tested. In particular, plaintiff objects to Dr. Snively's testimony that, based on its appearance, the helmet probably was not involved in the accident. Dr. Snively had added that the helmet would have to be disassembled to have a "complete picture." Plaintiff asserts that the jury should not have been exposed to this expert's findings since he was not "absolutely sure" of his findings. This point has been waived, however, by plaintiff's failure to object to this testimony at trial. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417.) Furthermore, "absolute" confidence in the truthfulness of an expert's findings is not a prerequisite to admission in evidence. (*Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 539, 343 N.E.2d 504.) The jury was advised of the qualification to Dr. Snively's opinion and, as trier of fact, judge his testimony accordingly. *Presswood v. Morris* (1979), 70 Ill. App. 3d 513, 517-18, 388 N.E.2d 844.

Next, plaintiff assigns error to Office Cotter's testimony on cross-examination, that he did not notice any damage to Reeves' helmet at the scene of the accident. Again, however, since plaintiff did not object to Cotter's testimony on the basis that the helmet was not disas-

sembled, this issue has not been properly preserved for review. Assuming *arguendo* that the question had not been waived, plaintiff's claim must still be rejected. Cotter did not testify as an expert as to whether the helmet had been impacted. He simply stated as a police officer what he did or did not notice at the accident scene.

■ Plaintiff maintains that the testimony of neurosurgeons Drs. Bryar and Matz regarding the protective qualities of the helmet was improper, because neither purportedly was an expert in helmet design. Dr. Bryar, who treated Reeves, stated that the helmet helped the latter survive the accident; Dr. Matz testified about damage to a person receiving a blow while wearing a helmet with facial protection. The circuit court did not abuse its discretion in allowing the neurosurgeons to so testify. (*Kinsey v. Kolber* (1982), 103 Ill. App. 3d 933, 952-53, 431 N.E.2d 1316; *Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 3d 283, 293, 216 N.E.2d 14.) Furthermore, even if admission of the testimony was misguided, any error was not prejudicial given the strong evidence in support of the jury's verdict.

### III

■ Plaintiff urges that defendants improperly argued the defense of assumption of risk and that the lack of facial protection was an open and obvious condition which barred recovery. In particular, error is found in the defense statement to the effect that the helmet protected the area covered, and the helmet "by its very essence was never meant to protect the face." Plaintiff's failure to object to these arguments at trial precludes him from raising it for the first time on appeal. (*Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 598, 294 N.E.2d 689; *County of Cook v. Colonial Oil Corp.* (1958), 15 Ill. 2d 67, 75, 153 N.E.2d 844.) Plaintiff had the burden of proving that the helmet was unreasonably dangerous, to an extent beyond that which would be contemplated by the ordinary consumer with ordinary knowledge as to the product's characteristics. (*Hunt.*) One factor in determining whether a danger is unreasonable is the extent to which it would be obvious to all those who come into contact with the product. (*Hunt; Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 467.) The statements challenged by plaintiff are related to the issue of whether the product was unreasonably dangerous and therefore constituted proper argument.

■ Plaintiff charges that defense counsel erred in his comment no one "could have made Donald Reeves put any type of helmet on his head," insisting that this constituted an improper assumption of risk argument. At trial, plaintiff made a general objection to this re-

mark, which was overruled. Assuming, for purposes of discussion, that the circuit court understood the basis for the general objection, plaintiff's position still cannot be sustained. The disputed statement bears only a tenuous connection to an assumption of risk defense. More significantly, the statement accurately reflects the fact that neither defendants nor the legislature itself were empowered to make plaintiff wear any kind of helmet. See *People v. Fries* (1969), 42 Ill. 2d 446, 450, 250 N.E.2d 149.

Plaintiff maintains defendants' attorney improperly implied during closing argument that Reeves was injured by a car accident not the helmet. There was substantial evidence that the helmet was not involved in the collision, however; defendants were entitled to argue the issue of proximate cause to the jury.

## IV

■ The circuit court is alleged to have erred in refusing to submit the following jury instruction proposed by plaintiff: "The defendants cannot avoid liability by attempting to show merely that they had done what the rest of their industry had done to make their product safe." Plaintiff observes that a "state of the art" defense is inapplicable in a strict products liability action. (See, *e.g., Gelsumino v. E. W. Bliss Co.* (1973), 10 Ill. App. 3d 604, 295 N.E.2d 110.) Other than a brief, ambiguous comment, respecting the type of helmet with the "face cover configuration such as the one that was shown," by the owner of a retail store in Bridgeview, plaintiff points to no evidence of a state of the art defense. Three experts in the field of helmet design testified that motorcycle helmets with facial protection were available at the time in question, thus eliminating or minimizing the possibility that the jury concluded that facial protection on helmets was unavailable or that defendants had done what the rest of the industry had done to make the helmet safe. Under these circumstances, the refusal by the court to permit the proposed instruction does not warrant reversal.

■ Plaintiff contends that the circuit court mistakenly refused his instruction number 12 to the effect that more than one person may be to blame for Reeves' injury. The content of this instruction was already given, in effect, to the jury in plaintiff's instruction No. 4, which stated that proximate cause need not be the only, last or nearest cause. Once clearly stated, a rule of law need not be restated in a different form of instruction. *Ostendorf v. Brewer* (1977), 51 Ill. App. 3d 1009, 1014, 367 N.E.2d 214.

## V

■ The next assignment of error concerns defense efforts to impeach two of plaintiff's witnesses. Defense counsel questioned Reeves' former wife respecting certain prior inconsistent statements made at her divorce proceedings. She did not remember giving the statements. Once counsel has laid a foundation for impeachment, he is under an obligation to offer proof of the allegedly impeaching statement. (*Rigor v. Howard Liquors, Inc.* (1973), 10 Ill. App. 3d 1004, 1008, 295 N.E.2d 491.) Here defense counsel failed to satisfy his obligation under the law by not offering evidence of those allegedly impeaching statements. Failure to follow through with proof of a prior inconsistent statement is not automatically reversible error, however. (*People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 897, 420 N.E.2d 461.) The prior inconsistent statements here concerned plaintiff's home and family life prior to the accident, not the fundamental question of liability, decided against plaintiff. The failure of defense counsel to offer evidence of the statements under these circumstances was not sufficiently prejudicial to require reversal. See *Purrazzo; Schoolfield v. Witkowski* (1964), 54 Ill. App. 2d 111, 126, 203 N.E.2d 460.

■ Finally, plaintiff charges that through innuendo and unfair inference, defense counsel attacked the credibility of plaintiff's expert, Rose, on the issue of his employment at Riddell, Inc. No objection was raised during the defense cross-examination of this subject; thus, the propriety of defendants' questioning has been waived for purposes of review. (*Kravis; Delany v. Badame* (1971), 49 Ill. 2d 168, 178, 274 N.E.2d 353.) Furthermore, under the facts of this controversy, any error in the cross-examination of Rose on his former employment would not necessitate reversal.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.