ARTHUR BRADFORD, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (3rd Division)   No. 83—2136

Opinion filed March 20, 1985.

Ray & Rizowy and Larry L. Fleischer & Associates, both of Chicago (Allen L. Ray and Kenneth J. Fleischer, of counsel), for appellant.

James D. Montgomery, Corporation Counsel, of Chicago (Jerome A. Siegan and Julie Elena Brown, Assistant Corporation Counsel, of counsel), for appellee.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

Plaintiff, Arthur Bradford, brought an action against defendant, city of Chicago, to recover damages for personal injuries sustained when the right front wheel of the Chicago Transit Authority (CTA) bus he was driving allegedly went into a pothole, causing him to bounce off the seat and eventually fall to the floor, thereby suffering serious back injury. The circuit court of Cook County entered judgment on the verdict of the jury finding for defendant and denied plaintiff's post-trial motion for judgment notwithstanding verdict or in the alternative for a new trial. Plaintiff appeals.

On appeal plaintiff contends in the alternative that: (1) he met the *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), and his motion for judgment notwithstanding verdict should have been granted; (2) the jury's verdict is against the manifest weight of the evidence; (3) defendant engaged in improper and prejudicial trial tactics which deprived plaintiff of a fair trial; (4) the trial court committed errors regarding jury instructions; and (5) the combination of errors at trial demonstrates the need for a new trial.

The evidence adduced at trial follows. William Smith, a retired employee of Illinois Bell Telephone Company (Illinois Bell), testified that in the spring of 1976 he was a conduit patrolman for Illinois Bell. His duties consisted of advising utility companies or contractors engaged in construction work of the location of Illinois Bell telephone lines and patrolling the lines. Mr. Smith was assigned to the Stewart District, which included the area of 87th Street at about Holland Road. Additionally, Mr. Smith travelled 87th Street in commuting to work daily. Eighty-seventh Street is spanned by three viaducts in the vicinity of Holland Avenue. Viaduct No. 2 is wide and low. During the winter of 1975-76, and the late spring and early summer of 1976, 87th Street, from the first viaduct to the third, was full of holes. In the eastbound lanes underneath viaduct No. 2, the holes were six to eight inches deep. The asphalt was gone in spots, and rails of the old street-car tracks could be seen. On cross-examination, Mr. Smith testified that he never measured the Illinois Bell manholes or the potholes. Estimating the depth of depressions was a matter of experience, quickly learned.

Fred Arnold, an assistant manager in charge of conduit at Illinois Bell, testified that he was assigned to the south side of Chicago, which included 87th Street at approximately Holland Road. He traveled 87th Street near Holland Road at least once a day, sometimes

five or six times a day. In the early spring and summer of 1976, the pavement along 87th Street from the first viaduct to the third was rough and rather bumpy. Viaduct No. 2 was low and pretty dark. Around April 7, 1976, Mr. Arnold received a work order to inspect two manholes on 87th Street near Holland Road and estimate the need for repair. He inspected the manholes on April 8, 1976. During the inspection Mr. Arnold had occasion to walk through viaduct No. 2. He noticed broken pieces of asphalt and potholes under the viaduct. He estimated the depth of the potholes at eight to 12 inches. The sewer covers in the area had dropped three to four inches. The asphalt was missing in places, exposing the brick work underneath. Between April and July 1976, Mr. Arnold did not notice any changes in the condition of the street.

Plaintiff testified that in the spring of 1976 he was employed by the CTA as an extra-board bus driver. The extra-board drivers are daily assigned the routes of absentee bus drivers. On the morning of May 10, 1976, plaintiff was assigned the 87th Street bus route and left the bus station at approximately 6:30 a.m. In the vicinity of Holland Street, the 87th Street route travels underneath three viaducts. The first viaduct is high, the second is low and dark and the third is higher and smaller than the second. Plaintiff had previously been assigned to the 87th Street route about four or five times, with the last assignment possibly being in the winter of 1975. He expected a bumpy ride and therefore reduced his speed to 20 miles per hour.[1] As he went through the second viaduct, the right front wheel of the bus went into a deep hole. He was thrown out of the driver's seat, landed first on the seat, which collapsed, and then on the floor of the bus. The bus rolled down 87th Street, went under the third viaduct, hit another bump and came to rest on the dirt curb. Plaintiff felt pain in his lower back and lay on the floor approximately 15 minutes because he could not move. Plaintiff then got up, inspected the bus, saw no damage, decided not to report the accident and continued with the route. Plaintiff returned to the bus station at approximately 7:45 a.m.

During a regularly scheduled break of about five hours, plaintiff went to Chicago State University, where he was a student in physical education, to use the steam and swimming facilities to ease his back pain. In the school locker room plaintiff found that he was unable to untie his shoes to disrobe. Plaintiff left the school and returned to work, where he took two aspirins and lay on a couch. Later that day plaintiff drove a second route, at the completion of which he was un-

---

[1]Plaintiff testified that the speed limit was 30 miles per hour.

able to get out of his seat and turn the bus in. Plaintiff then informed his supervisor of the accident and was taken to the emergency room of St. Bernard Hospital. That same night plaintiff was transferred to Englewood Hospital, where he remained until May 25, 1976.

Dr. Richard O'Young, an orthopedic surgeon, testified that he saw plaintiff on May 10, 1976, at St. Bernard Hospital. Plaintiff was then transferred to Englewood Hospital, where he examined him. Plaintiff complained of acute lower back pain and gave a history of having been injured when the bus he was driving fell into a hole. X rays taken of plaintiff's lower back were negative for bone involvement.[2] Dr. O'Young started plaintiff on a conservative regimen of treatment consisting of pain medication, muscle relaxants, anti-inflammatory medication, a bed board and traction. Plaintiff obtained some relief from the treatment but was not cured. Residual symptoms persisted. Plaintiff had difficulty walking and crutches were prescribed for him. Plaintiff was released after 15 days at the hospital. Thereafter, plaintiff received physical therapy treatment as an outpatient. Dr. O'Young diagnosed plaintiff's condition as low back pain syndrome with possibility of a herniated disc.

On July 6, 1976, plaintiff was admitted at St. Bernard's Hospital complaining of a tingling sensation in the back and in the foot, pain and spasm of the paravertebral muscles. An examination by Dr. O'Young revealed tenderness and spasm along the dorsal and lumbar vertebrae and restriction of spinal movements. Plaintiff was discharged from the hospital on July 13, 1976. Plaintiff continued consultation with Dr. O'Young until October 1976.

Dr. Allen Hirschtick, an orthopedic surgeon, testified that he examined plaintiff on April 27, 1978. Plaintiff complained of pain and stiffness of the lower back and wore a back support. During the course of examination Dr. Hirschtick noted localized tenderness over the lumbosacral junction (the area where the spine joins the pelvis), restriction of forward flexion, loss in the range of extension of the spine (bending backward) and obtained positive straight leg raising test results indicative of trouble in the lumbosacral junction area. Dr. Hirschtick diagnosed plaintiff's condition as lumbar disc syndrome, meaning that plaintiff had the symptoms and findings of injury to one or more vertebral discs in the lumbar spine. The doctor's diagnosis

---

[2]Dr. O'Young explained that a normal X ray of the lumbosacral spine means that the bone is not broken. It does not mean that the vertebral discs are not involved. It does not mean ligaments are not involved. It does not mean the patient is free of pain.

was confirmed by an X ray taken of plaintiff's lumbosacral spine two days before trial which showed a narrowing of the disc space between the fifth lumbar vertebra and the sacrum and new bone growth in the area. These changes are the result of degeneration of the vertebral disc.[3] Dr. Hirschtick further testified that plaintiff suffered a permanent disability amounting to 65% of the left leg and 50% of the right leg. Moreover, plaintiff would not be able to return to work as a bus driver because of pressure on the spine from prolonged sittings.

In response to a hypothetical question posed by plaintiff's counsel, Dr. Hirschtick opined that there might be a causal connection between the injury and the way in which plaintiff described he was injured. The hypothetical question was expanded by defense counsel to include a "car accident in 1979 involving the same area of the person's back, the same type symptoms as to the back pain—tingling in the legs." Defense counsel then asked Dr. Hirschtick if the car accident in 1979 could have created the disc degeneration that showed up in the latest X rays of plaintiff's spine.[4] That question was never answered. On redirect examination, Dr. Hirschtick testified that a significant injury in 1979 could aggravate the problems found in 1978. However, when he saw plaintiff in 1978, the changes were permanent.

Gerald Kukowski, a CTA paymaster, testified that plaintiff was paid at a lower rate after the accident because plaintiff could only work as a CTA collector and not as a CTA bus driver.

■ We deal first with plaintiff's contention that the trial court should have granted his post-trial motion for judgment notwithstanding verdict. We disagree. "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) In the present case plaintiff testified that: he left the bus station at approximately 6:30 a.m.; the accident occurred at approximately 6:45 a.m.; he lay on the floor of the bus for approximately 15 minutes; he resumed the bus run and picked up more than the usual number of passengers due to the delay; the bus had a layover of seven minutes at the Chicago Vocational

---

[3]X rays taken of plaintiff's back in 1978 were normal. However, Dr. Hirschtick testified that in many cases of disc problems changes in the space occupied by the disc and in the bone do not appear on the X rays for several years.

[4]The changes in the hypothetical question were allowed subject to counsel ultimately tying up some information on the car accident. Counsel never brought in evidence to substantiate the 1979 accident.

school; and he completed the run at approximately 7:45 a.m. Plaintiff further testified that on a normal day the 87th Street route lasts 30 minutes each way, with a seven-minute layover at the Chicago Vocational school. On cross-examination, plaintiff was impeached as to the length of time he lay on the floor of the bus after the accident. At trial plaintiff testified that he stayed immobile on the floor approximately 15 minutes. At his deposition in January 1979, plaintiff testified that he stayed on the floor approximately 20 to 25 minutes. Plaintiff was also impeached in these regards: the weather conditions on the day of the accident (at trial, cloudy; at deposition, as he came out from under the first viaduct, the sun came into his eyes and he saw a depression in the road); his familiarity with the bus route and street conditions (at trial, he was assigned the 87th Street run four or five times; at deposition, he had driven the route more than ten times before the accident); whether he exited the bus to check damages to the right front wheel (at trial, he held on the bus rail and looked out of the bus to the front wheel; at deposition, he got out of the bus to see if any damage was done to the bus); and his observations upon returning to the site of the accident (at trial, he saw a hole in the street with a metal grate at the bottom. The hole was approximately 1½ feet deep and contained lots of debris; at deposition, he determined that he had hit a manhole, there were not potholes in the right hand lane). Further, plaintiff waited approximately 11 hours before reporting the accident. Lastly, we note that plaintiff was the sole witness of the accident. Upon the facts of the case, we cannot say that the evidence, when viewed in its aspect most favorable to defendant, so overwhelmingly favors plaintiff that no contrary verdict based on that evidence could ever stand.

We conclude that the trial court properly denied plaintiff's motion for judgment notwithstanding verdict. We next determine whether certain trial tactics utilized by defense counsel were so prejudicial to plaintiff as to require a new trial.

■ During cross-examination, defense counsel asked plaintiff to examine a document which purported to be the trip sheet prepared by plaintiff on the day of the accident. A trip sheet is a schedule indicating the times a CTA bus driver arrives at certain locations along the bus route. The trip sheet shown plaintiff contained his name and badge number but was unsigned. Defense counsel then had plaintiff read the times indicated on the trip sheet, which showed that plaintiff arrived at each location along the route on schedule. Toward the end of the examination, plaintiff was asked whether the trip sheet shown him was a true copy of the original, and he replied no. Plaintiff

pointed to contradictions in the trip sheet, denied that the handwriting was his, and informed counsel that another bus driver by the name of Bradford worked in the same CTA bus station. The trip sheet was not offered into evidence.

Plaintiff maintains that defense counsel's use of the trip sheet during cross-examination constituted an attempt to impeach plaintiff's testimony on direct examination that he lay on the floor of the bus for approximately 15 minutes after the accident, and defense counsel's subsequent failure to call witnesses to complete said impeachment prejudiced plaintiff and necessitates a new trial. Defendant maintains that plaintiff has waived any error in the use of the trip sheet during cross-examination by failing to make a timely objection or motion to strike. Alternatively, defendant maintains that counsel's use of the trip sheet was done in good faith and did not prejudice plaintiff.

We are of the opinion that defense counsel's use of the trip sheet deprived plaintiff of a fair trial. We therefore consider the assignment of error despite plaintiff's failure to object to the use of the trip sheet. *Ryan v. Blakely* (1979), 71 Ill. App. 3d 339, 389 N.E.2d 604; *Blake v. Delhotel* (1976), 39 Ill. App. 3d 725, 350 N.E.2d 880.

In *Rigor v. Howard Liquors, Inc.* (1973), 10 Ill. App. 3d 1004, 295 N.E.2d 491, defense counsel attempted to lay a foundation for impeachment of a witness by reading questions and answers from a deposition taken of the witness. The witness admitted coming in for the deposition, but his signature was not on the transcript. After the witness' testimony, defendants advised the court that they were unable to call the court reporter who had attended the deposition, but could produce another reporter to verify the accuracy of the deposition transcript. The trial court, however, ruled that defendants were not required to make an offer of proof because of plaintiff's failure to object to the use or authenticity of the deposition.

In reversing the lower court, the appellate court stated that "[t]he rule in Illinois regarding impeachment by a prior inconsistent statement is that, once counsel has laid a foundation for impeachment, he is under an obligation in law to offer proof of the allegedly impeaching statement." (10 Ill. App. 3d 1004, 1008, 295 N.E.2d 491.) The court observed that "[t]he only exception to this rule occurs when the witness admits that he made the prior statement." (10 Ill. App. 3d 1004, 1008, 295 N.E.2d 491.) The court further observed that "innuendoes involved in allegedly impeaching questions on a material issue are highly prejudicial." 10 Ill. App. 3d 1004, 1009, 295 N.E.2d 491.

In the instant case, the trip sheet shown to plaintiff during cross-examination was unsigned. Further, plaintiff informed defense counsel

that the trip sheet was not a true copy of the original. Plaintiff noted several contradictions in the trip sheet, stated that the handwriting was not like his own, and informed counsel that another driver by the name of Bradford worked in the same CTA station. In face of plaintiff's denial, defense counsel failed to call witnesses to authenticate the document and complete the impeachment. Counsel was under an obligation in law to do so. *Walker v. Maxwell City, Inc.* (1983), 117 Ill. App. 3d 571, 581, 453 N.E.2d 917; *Bailey v. City of Chicago* (1983), 116 Ill. App. 3d 862, 864, 452 N.E.2d 680; *Rigor v. Howard Liquors, Inc.* (1973), 10 Ill. App. 3d 1004, 1008, 295 N.E.2d 491.

We note that in some cases the failure of defense counsel to offer evidence of the prior inconsistent statements may not be sufficiently prejudicial to require reversal. (*Walker v. Maxwell City, Inc.* (1983), 117 Ill. App. 3d 571, 581, 453 N.E.2d 917; *Oak Lawn Trust & Savings Bank v. City of Palos Heights* (1983), 115 Ill. App. 3d 887, 898, 450 N.E.2d 788.) Such is not the case here. Plaintiff's credibility was of great import since he was the only occurrence witness. The trip sheet indicated that plaintiff was on schedule at every location along the bus route on the morning of the accident. It thus contradicted plaintiff's testimony that he was in great pain after the accident and lay on the floor of the bus for approximately 15 minutes. Further, the trip sheet raised serious doubt that plaintiff was injured at the time and in the manner testified thereto.

■ We also note that in closing argument defense counsel returned to the subject of the trip sheet and made the following remarks:

"What about the trip sheet? The trip sheet has the times that he was scheduled to be at a certain place at a certain time. I went through that trip sheet with Mr. Bradford and the scheduled returns that were scheduled with the times were exactly the same times as the one of the actually [*sic*] operation of that bus—

[PLAINTIFF'S COUNSEL]: I am going to object. That's not in evidence.

THE COURT: Objection overruled. This is argument.

[DEFENSE COUNSEL]:—at the time of the accident. In the morning, May 10, 1983, [*sic*] it wasn't off one minute, not one. Where did the 15 minutes he laid on the floor of the bus or 20, 25 go? Where did that go? Did it evaporate?

As I stated, ladies and gentlemen, you will judge the credibility of the witnesses and all we have here is Mr. Bradford's credibility to prove that he hit the pothole on the day in question."

The proper foundation was never laid for introduction of the trip sheet into evidence, nor did defense counsel ever offer the trip sheet into evidence. Yet, defense counsel's argument suggests that plaintiff's direct testimony was impeached by a prior inconsistent statement, *i.e.*, the trip sheet, and that plaintiff's credibility was in question. We further note that during deliberations the jury requested to view "defense—Evidence Nos. 1, 2 and 3." Defense exhibit No. 3 was the trip sheet. The jury's request clearly indicates that the jury believed the trip sheet to be in evidence.

We conclude that plaintiff was denied a fair trial by defense counsel's use of the trip sheet. We therefore remand the case for a new trial. In light of this holding, we do not address plaintiff's contention that the verdict of the jury was against the manifest weight of the evidence, nor do we address the other assignments of error brought by plaintiff.

For the aforementioned reasons, that portion of the order of the circuit court of Cook County entering judgment for defendant on the verdict is reversed, and that portion denying plaintiff's post-trial motion for judgment notwithstanding verdict is affirmed.

Affirmed in part and reversed in part.

McNAMARA and McGILLICUDDY, JJ., concur.